**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 17, 2011

Lyle W. Cayce
Clerk

No. 09-60072
Summary Calendar

THE WINDSOR PLACE,

Petitioner

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Respondent

Petition for Review from the U.S. Department of Health and Human Services,
Departmental Appeals Board
No. A-08-110

Before WIENER, PRADO, and OWEN, Circuit Judges.

PER CURIAM:[*]

The Windsor Place Nursing & Rehab Center ("Windsor") petitions this
Court for review of the final decision of the Departmental Appeals Board
("DAB") of the U.S. Department of Health and Human Services ("HHS") finding
that Windsor was in substantial noncompliance with regulations covering skilled
nursing facilities, and affirming civil monetary penalties ("CMPs") and denial of
payment for new admissions ("DPNA"). Finding that the DAB's decisions are

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

supported by substantial evidence and are not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, we dismiss Windsor's petition for review.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Windsor is a skilled nursing facility in Columbus, Mississippi that participates in the federal Medicare and Medicaid programs. On behalf of the Centers for Medicare & Medicaid Services ("CMS"), the Mississippi State Department of Health conducted surveys of Windsor to determine whether Windsor was in substantial compliance with applicable laws and regulations. Based on a survey conducted on September 24, 2004, CMS determined that Windsor was not in substantial compliance with four regulations, three of which are relevant to this appeal: (1) 42 C.F.R. § 483.20(b)(2)(ii), requiring the facility to complete a "comprehensive assessment" of a resident after it "determines, or should have determined, that there has been a significant change in the resident's physical or mental condition"; (2) 42 C.F.R. § 483.25(c), requiring that "a resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable"; and (3) 42 C.F.R. § 483.25(a)(3), requiring the facility to ensure that "a resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene." Based on the four violations, CMS imposed CMPs of $350 per day effective September 24, 2004, until Windsor achieved substantial compliance, and a proposed DPNA unless Windsor reached substantial compliance before October 27, 2004.

Based on an October 22 visit, CMS determined that Windsor's noncompliance with the fourth violation from September 24 (not on appeal) continued at an increased scope and severity. It did not address the three other violations at issue from September 24. Based on an October 28 visit, CMS

No. 09-60072

concluded that while Windsor had remedied its previous violations as of October 27, it was not in compliance with three additional regulations, including one contested in this petition: self-administration of drugs by a resident without a previous determination by Windsor that this practice was safe, in violation of 42 C.F.R. § 483.10(n).  Based on these violations, CMS assessed CMPs of $150 per day, effective October 28 through December 21, 2004, when CMS determined that Windsor had remedied the violations.

Windsor appealed all of the violations to an HHS Administrative Law Judge ("ALJ").  The ALJ upheld all of CMS's determinations of noncompliance with two exceptions.  The ALJ reversed the fourth violation from the September 24 survey and by extension that violation's continuance in the October 22 survey, and reversed one violation from the October 28 survey—neither of these violations are at issue in this appeal.  On November 26, 2008, the DAB affirmed the ALJ's decision except with respect to one of the two remaining October 28 violations.  It reversed and remanded that violation, which is not at issue on appeal. Windsor filed its petition for review on February 2, 2009.  It then moved to stay proceedings in this case, and we dismissed the petition without prejudice to the right of either party to reinstate the petition.  On August 17, 2010, we granted Windsor's motion to reinstate the petition.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over the final decision of HHS regarding Medicare-program compliance pursuant to 42 U.S.C. § 1320a-7a(e).  Our review of the DAB's final decision is governed by the Administrative Procedure Act ("APA"), "which permits the setting aside of agency actions, findings, and conclusions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law' or 'unsupported by substantial evidence.'"  *Cedar Lake Nursing Home v. U.S. Dep't of Health & Human Servs.*, 619 F.3d 453, 456 (5th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A), (E)).  Additionally, "findings of the Secretary [of

No. 09-60072

HHS] with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 42 U.S.C. § 1320a-7a(e). While CMS has the burden of production to establish a prima facie case of noncompliance with a regulation, once CMS has met this burden, the provider has the ultimate burden of persuasion that it was in substantial compliance with the regulation at issue. *See Hillman Rehab. Ctr. v. Health Care Fin. Admin.*, DAB 1611 (1997), *aff'd sub nom. Hillman Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, No. 98-CV-3789, 1999 WL 34813783 (D.N.J. May 13, 1999).

## III. DISCUSSION

Windsor contests the findings of noncompliance and the CMPs assessed for the three remaining citations stemming from the September 24, 2004 survey and the one remaining citation stemming from the October 28, 2004 survey. It also challenges the imposition of the DPNA on October 27, 2004, arguing that it was in substantial compliance prior to that date.

## A. 42 C.F.R. § 483.20(b)(2)(ii)

42 C.F.R. § 483.20(b)(2)(ii) requires that a facility conduct a significant-change assessment

> [w]ithin 14 calendar days after the facility determines, or should have determined, that there has been a significant change in the resident's physical or mental condition. (For purposes of this section, a "significant change" means a major decline or improvement in the resident's status that will not normally resolve itself without further intervention by staff or by implementing standard disease-related clinical interventions, that has an impact on more than one area of the resident's health status, and requires interdisciplinary review or revision of the care plan, or both.)

*Id.* CMS found Windsor in noncompliance with § 483.20(b)(2)(ii) based on findings in the September 24, 2004 survey that Windsor had failed to conduct a significant-change assessment for Resident 14 after she developed two Stage II pressure ulcers on February 17, 2004, and two more Stage II pressure ulcers on

No. 09-60072

March 1, 2004. By March 8, one of those ulcers worsened to a Stage III ulcer that was one-by-one centimeters and 0.8 centimeters deep, and by March 15, another worsened to a Stage IV ulcer that was five-by-six centimeters and six centimeters deep with tunneling. Windsor did not undertake a significant-change assessment until April 29, 2004.

Windsor argues, as it did in the agency proceedings, that CMS failed to make a prima facie case of noncompliance because it failed to produce evidence that the pressure sores had "an impact on more than one area of the resident's health status" as required for a "significant change" in health status. It contends that the evidence produced shows that the ulcers affected only skin integrity, and that the DAB's determination that nutritional needs and pain were also implicated was merely speculative. We disagree.

As a first matter, the record shows, and the ALJ and DAB found, that Windsor's staff consulted a dietician on more than one occasion to address the patient's dietary needs with regard to the pressure sores. One of the progress notes also discusses how different vitamin and dietary supplements were meeting her protein and fluid needs but not her caloric needs. While these dietary consultations may have related to remedying the skin-integrity problems rather than addressing separate dietary concerns, this evidence is sufficient to support a finding that the pressure sores implicated the patient's dietary needs.

Windsor nonetheless contends that the sores could not have affected the patient's nutritional status absent evidence of substantial weight gain or loss. Windsor is correct that the preamble to the rulemaking for this section notes ten areas of decline that *may* be characterized as "significant changes," including "unplanned weight loss problem." *See* 62 Fed. Reg. 67,174, 67,196–97 (Dec. 23, 1997). The DAB correctly notes, however, that the preamble list is not intended to be exclusive. Additionally, while § 483.20(b)(2)(ii) requires that the significant change affects more than one area of the patient's health status, it does not

require that all of the areas that are affected themselves indicate a significant change.

Additionally, the DAB and ALJ's findings concerning pain are also supported by substantial evidence. Given the description of the patient's ulcers, which included tunneling of six centimeters deep, it is hard to believe that the patient was not also in severe pain. The ALJ and DAB's decision not to credit nurses notes observing no distress during the relevant time period was also not erroneous, as the patient's ability to communicate and be understood was limited, and the patient's daughter later expressed concern about her mother's pain. Therefore, we find that the DAB's determination was supported by substantial evidence and was not arbitrary and capricious.

**B.    42 C.F.R. § 483.25(c)**

42 C.F.R. § 483.25(c) requires that a facility ensure that "a resident who enters the facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable." The DAB has previously determined that "a pressure sore can be considered unavoidable only if routine preventive care is provided." *Livingston Care Ctr. v. Ctrs. for Medicare & Medicaid Servs.*, DAB No. 1871 (2003), *aff'd sub nom. Livingston Care Ctr. v. U.S. Dep't of Health & Human Servs.*, 388 F.3d 168 (6th Cir. 2004).

The DAB affirmed the ALJ's findings that in January and February of 2004, prior to the development of the ulcers in February and March, Windsor failed to follow its own care-plan measures despite its knowledge of the patient's high risk. Windsor challenges the DAB's determination on the grounds that it took appropriate steps to prevent the pressure sores and therefore their occurrence was unavoidable. It cites to evidence from the patient's care plans showing that as early as the patient's admission in 2002, the plans provided for "more than routine preventative care," including (1) providing lotion to

extremities twice a day; (2) performing weekly skin assessments; (3) turning and repositioning the patient every two hours; (4) providing air mattresses; (5) providing daily whirlpool baths; (6) providing nutritional supplements; and (7) using Hoyer lifts for transport. It contends that its early provision of these services rebuts the ALJ's finding that the services it provided were only after the development of the pressure sores.

While it is true that the services listed above were in the patient's care plans as early as her admission in 2002, this fails to rebut the ALJ and DAB's central finding: that Windsor failed to follow its own plan of preventative care in the months immediately preceding the development of the pressure sores. While the provision of these services would have constituted routine preventative care and rendered the pressures sores unavoidable, Windsor fails to show that it continued to provide all of the named services in January and February of 2004. Citing to care plans from previous years does not contradict the ALJ and DAB's findings. We find no error in the DAB's holding.

## C.    42 C.F.R. § 483.25(a)(3)

42 C.F.R. § 483.25(a)(3) requires that a facility ensure that "[a] resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene." *Id.* The DAB affirmed the ALJ's findings that the regulation contemplates that residents who cannot meet their own care needs have a method by which to summon staff. Because Windsor used call bells, the ALJ found that those call bells must be accessible to the residents who need them. Windsor does not challenge this finding in its brief on appeal. The DAB affirmed the ALJ's findings that call bells were not accessible to three residents who needed them. One resident was unable to reach the call bell that was attached to her bed sheet above her right shoulder. For the second resident, the call bell was located on the floor under the head of the bed, out of reach of the resident, who was sitting

No. 09-60072

in a wheelchair at the bed's foot. The third resident's call bell was located on the floor out of reach of the resident, who was located near the door in a wheelchair.

Windsor raises two challenges to the findings of noncompliance. First, it argues that it presented evidence to show that the call bells actually were accessible to each resident. But we find that the DAB correctly ruled that Windsor had presented no evidence that rebuts the findings of inaccessibility. Its argument that the first resident could have used her non-paralyzed arm to reach for the bell is speculative and is not supported by the resident's own assertion of inaccessibility. As to the second and third residents, it cited no record evidence that an additional call bell was actually accessible or that the resident positioned near the door was near enough to a nurses's station that his calls would have been heard.

Second, Windsor argues that regardless of the call bells' accessibility, none of the residents were in need of care at the time the violations were found and therefore suffered no negative outcomes. Specifically, it contends that two of the residents "were up wandering around at the time" and another was sitting in the hallway "positioned to yell at those who passed by him." We agree with the DAB that a negative outcome need not occur for CMS to find that the service offered was insufficient. Nothing in the text of § 483.25(a)(3) indicates that in order for a service to be necessary, a resident first show previous harm from its absence. The DAB's holding was supported by substantial evidence and was not in error.

**D.    42 C.F.R. § 483.10(n)**

42 C.F.R. § 483.10(n) provides that a patient is allowed to self-administer drugs only if an "interdisciplinary team . . . has determined that this practice is safe." *Id*. The DAB affirmed the ALJ's findings of noncompliance with the regulation based on the October 28 survey. Those findings reflect that a resident was found with glaucoma eye-drops but that no assessment had been conducted to determine if that resident was able to safely self-administer the drugs. On

8

October 28, such an assessment concluded that the patient was not able to so. Windsor submitted a plan of correction on December 8 in which it claimed that it had instituted procedures to assure substantial compliance facility-wide. On December 22, state inspectors conducted a visit, and CMS determined that Windsor was in substantial compliance as of December 21 based on that visit.

On appeal, Windsor challenges only the DAB's determination of the date of substantial compliance, arguing that it had instituted all of the measures in its plan by December 8, the date of its submission. We agree with the DAB that Windsor has failed to present evidence of its compliance before December 21. Windsor's mere assertions that it had instituted all of the measures prior to the revisit fails to rebut the finding that compliance could not be verified until the December 22 revisit. Therefore, the DAB's decision was supported by substantial evidence and was not erroneous.

## E.　Imposition of the DPNA

As an additional matter, Windsor claims that CMS erred in imposing the DPNA, because the October 22 inspection was a revisit survey that established only one continuing violation, which was later overturned. Therefore, Windsor claims, CMS implicitly found Windsor in compliance with the three other September 24 violations as of the October 22 inspection.

The DAB found, however, that the October 22 survey did not concern the remaining three violations stemming from the September 24 survey. It noted that it would be unlikely for CMS to increase the CMP to $550 if Windsor had corrected three of the four violations. Additionally, CMS found that Windsor had remedied the September 24 violations only based on the October 28 survey. The DAB also noted that Windsor's own compliance plan had an October 25 completion date. Based on this evidence, Windsor's claim does not hold water. We find that the DAB's determination was supported by substantial evidence,

No. 09-60072

and based on the date of substantial compliance, that CMS did not improperly impose the DPNA.

## IV. CONCLUSION

For the foregoing reasons, we find the DAB's determination are supported by substantial evidence in the record and are not arbitrary and capricious or an abuse of discretion.  We therefore dismiss Windsor's petition for review.

PETITION DISMISSED.