**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 7, 2013

Lyle W. Cayce
Clerk

No. 12-60420

MISSISSIPPI CARE CENTER OF GREENVILLE,

Petitioner

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Respondent

Petition For Review of a Decision
of the Department of Health and Human Services
(A-12-28)

Before STEWART, Chief Judge, DAVIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

On May 9, 2010, one of the residents at the Mississippi Care Center, a nursing home in Greenville, Mississippi,  left the facility without permission or supervision and wandered out onto the street.  Although the resident was spotted by a staff member and safely returned to the facility, the Centers for Medicare & Medicaid Services found that, as a result of the facility's inability to prevent such incidents, the nursing home's residents were in immediate

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-60420

jeopardy. The Mississippi Care Center was fined approximately $85,000 and ordered to amend its policies and procedures. The Mississippi Care Center requested a hearing before an administrative law judge and, upon an adverse ruling, appealed to the administrative review board. The administrative review board upheld the ALJ's findings. On appeal to this court, the Mississippi Care Center challenges the Center for Medicare and Medicaid Service's factual findings and determination that the Center's residents were in immediate jeopardy. Because the Mississippi Care Center has not satisfied its burden of showing that CMS's findings were unsupported by substantial evidence, or that the agency's legal conclusions were arbitrary or capricious, we AFFIRM.

## I. FACTUAL BACKGROUND

The Mississippi Care Center of Greenville, Mississippi ("MCC") is a nursing home that provides skilled nursing services for which it receives payment assistance from Medicare. The Centers for Medicare & Medicaid Services ("CMS") is the federal agency responsible for enforcing the health and safety regulations governing skilled nursing facilities ("SNFs") such as MCC. In order to receive payment assistance from Medicare, an SNF must enter into and maintain a "provider agreement" with CMS, *see* 42 U.S.C. §§ 1395cc(a), (b), that mandates that the SNFs maintain "substantial compliance" with certain minimum standards of care, *id.* § 1395i-3(h)(2). To be in "substantial compliance" under the statute, an SNF must ensure that "any identified deficiencies[1] pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301.

This appeal arises out of an incident involving one of MCC's wheelchair-bound residents (the "Resident") who was admitted to the facility on April 14,

---

[1] Instances of noncompliance are referred to as deficiencies.

No. 12-60420

2010, following his hospitalization for cardiac arrest with anoxic encephalopathy, hypertension, expressive aphasia, and amputation of the leg above the right knee. At the time of his admission, the Resident was heavily medicated and was not an elopement risk. As his condition improved, however, he became more active and started wandering around the facility. Then, on May 9, 2010, the Resident left the nursing home at approximately 7:00pm without permission or supervision.[2] An MCC staff member in a nearby parking lot observed that the Resident was outside the building, and immediately accompanied him across the street to a nearby Kwik Mart until another staff member could assist with returning him to MCC. Upon the Resident's return, he was placed on 24-hour, one-on-one supervision by an MCC staff member.

Notwithstanding MCC's 24-hour supervision, the Resident attempted to elope again that same night. While the charge nurse was on the phone with the Director of Nursing, the Resident slipped out of the nurse's reach and onto the nearby elevators. The charge nurse quickly buzzed the laundry department on the first floor, and the Resident was intercepted either on the first floor of the facility or immediately outside the facility.[3] The Resident remained on 24-hour supervision until his transfer to a separate geripsych unit on May 12, 2010. MCC self-reported the incident to the Mississippi State Department of Health ("MSDH") via telephone on May 12, and again by written report on May 17, 2010.

An MDSH surveyor visited MCC on May 20, 2010, to determine whether there was a risk of immediate harm to the other residents after the Resident's

---

[2]    This type of incident is deemed an "elopement" by industry participants.

[3] The parties debate whether the Resident simply left the second floor or actually left the facility. There are multiple incident reports suggesting that the Resident was intercepted at the first floor laundry room, and one report suggesting that the Resident actually left the premises. These factual discrepancies will be discussed in further detail in Section III(A), *infra*.

3

elopement on May 9. The surveyor left without making any findings on whether MCC was in substantial compliance with the regulations. Twelve days later, a second MDSH surveyor returned to MCC to complete the survey. Based on the second surveyor's reports, CMS determined that MCC was not in compliance with two specific regulations, 42 C.F.R. § 483.13(c), which requires a facility to "develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents and misappropriation of resident property," and § 483.25(h), which requires a facility to "ensure that the resident environment remains as free of accident hazards as is possible; and each resident receives adequate supervision and assistance devices to prevent accidents." CMS deemed MCC's residents to be in "immediate jeopardy" as a result of that noncompliance.[4] The immediate jeopardy was cited at a "J" level starting on the date of the incident, May 9, and continuing until June 2, 2010.[5]

On June 18, 2010, CMS notified MCC that it would impose penalties for the two immediate jeopardy findings. MCC requested a hearing before an administrative law judge ("ALJ") to challenge CMS's findings of noncompliance with the regulations. The ALJ conducted a hearing and found that MCC was out of compliance with the above regulations, that CMS's determinations of immediate jeopardy and the duration of immediate jeopardy were not clearly erroneous, and that the civil monetary penalties imposed for the period of noncompliance was reasonable. MCC then appealed to the Civil Remedies

---

[4] SNFs are not required to be in absolute compliance with the regulations, and instead, must only be in "substantial compliance" in order to be deemed operable. An SNF that is not in substantial compliance with the regulations is given a rating based on the level of its noncompliance (also referred to as a "deficiency"). There are four levels of noncompliance. Only Level 4 deficiencies, which present "immediate jeopardy to resident health or safety," are at issue here. A finding of Level 4 deficiencies, or immediate jeopardy, carries significant fines and penalties and requires the SNF to correct and remove the deficiencies within 23 days of the last survey or have its Medicare residents transferred to another facility.

[5] Within the immediate jeopardy category, deficiencies are determined to be isolated (level "J"), part of a larger pattern (level "K"), or widespread throughout the SNF (level "L").

No. 12-60420

Division of the Health and Human Services Departmental Appeals Board ("DAB"), which concluded that the ALJ's decision was supported by substantial evidence and free from legal error. Having exhausted its administrative remedies, MCC timely appeals to this court.

## II. STANDARD OF REVIEW

We will uphold the HHS Secretary's factual findings if they are supported by "substantial evidence on the record considered as a whole." 42 U.S.C. § 1320a-7a(e); *see also Cedar Lake Nursing Home v. U.S. Dept. of Health & Human Servs.*, 619 F.3d 453, 456 (5th Cir. 2010). "Substantial evidence is more than a scintilla and less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). Although CMS has the initial "burden of production to establish a prima facie case of noncompliance with a regulation . . . the provider has the ultimate burden of persuasion that it was in substantial compliance with the regulation at issue." *Windsor Palace v. U.S. Dep't of Health and Human Servs.*, 649 F.3d 293, 297 (5th Cir. 2011).

We will uphold the Secretary's legal conclusions unless they are "arbitrary, capricious, an abuse of discretion, or not in accordance with the law." *Id.*

## III. ANALYSIS

On appeal, MCC challenges the ALJ and DAB's conclusion that CMS's determination that MCC violated §§ 483.13(c) and 483.25(h) was supported by substantial evidence. Additionally, MCC contends that the conclusion that MCC's alleged deficiencies constituted immediate jeopardy was arbitrary and capricious, and the duration of any immediate jeopardy was far less than CMS originally determined.

*A.  42 C.F.R. § 483.13(c)*

Pursuant to § 483.13(c), SNFs "must develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents and misappropriation of resident property." The regulation requires that SNFs both *develop* policies and procedures to prevent neglect and *implement* those procedures. *See Life Care Ctr. of Gwinnett*, DAB 2240, at *4 (2009) (H.H.S.) ("A written policy must adequately address the risks of neglect . . . Procedures which are not carried out in practice are worthless."). Thus, a SNF's failure to either develop or implement the required procedures is sufficient to preclude substantial compliance.

The ALJ found that MCC had not developed written policies and procedures to prevent elopement. At the time of the Resident's elopement, MCC had at its disposal two elopement prevention systems—door lock keypad codes and security cameras—that it relied on in practice, but did not reference in its written policies and procedures. The ALJ also found that MCC's failure to ensure that these systems were functioning and being used properly by staff, through the provision of written policies and procedures, facilitated the Resident's elopement. In addition, the ALJ cited surveyor testimony that MCC routinely gave door lock codes to visitors, but did not have written policies and procedures addressing who should be given access to the codes, how often they should be changed, or how to instruct visitors not to share the codes or let the residents out. Nor did MCC provide instructions to its staff on how to monitor the security cameras that were installed at the entrance to each set of elevators.

Although MCC acknowledged that its written policies and procedures did not address the keypad codes or security cameras, it argued that such measures were unnecessary in light of its other numerous policies and procedures that specifically addressed elopement. According to MCC, these additional policies and procedures were sufficiently comprehensive to instruct its staff on how to

prevent resident elopement. The testimony of MCC staff, however, indicates that there was at least some confusion as to the standard course of procedure for addressing elopement. Moreover, this argument does not refute the ALJ's and DAB's conclusion that, if MCC chose to rely on the keypad door locks and security cameras to protect its residents from elopement, it should have provided corresponding written policies to instruct its staff on how to use them properly. The fact that MCC had the ability to use its keypad door locks and security cameras to further prevent the elopement of its residents, in combination with the fact that its other policies were clearly inadequate to prevent elopement (as evidenced by the actions of the Resident), suffice to show that the ALJ's and DAB's holdings were supported by substantial evidence.

*B. 42 C.F.R. § 483.25(h)*

Section 483.25(h) requires an SNF to ensure that "(1) The resident environment remains as free of accident hazards as is possible; and (2) Each resident receives adequate supervision and assistance devices to prevent accidents." The HHS and federal courts have interpreted "[t]he standard of care imposed by these 'as is possible' and 'adequate supervision' regulations . . . as a 'reasonableness' standard." *Cedar Lake*, 619 F.3d at 457.

After reviewing the circumstances surrounding the Resident's elopement, the ALJ determined that MCC failed to provide him with supervision and assistance devices adequate to control his established tendency to wander around the facility. On account of these failures, the Resident was able to leave the facility on at least one occasion without staff knowledge or supervision. The ALJ further noted that the Resident's elopement resulted from his ability to get on the elevator unseen and then walk out the front door, despite the presence of security cameras and keypad door locks. As a whole, the ALJ and DAB found these circumstances were sufficient to constitute a violation of the requisite standard of care.

No. 12-60420

In response, MCC argues that the ALJ and DAB employed a strict liability standard by finding that MCC violated the regulation simply because the Resident eloped. Specifically, MCC contends that the Resident's elopement was not foreseeable, and thus should not have constituted a deficiency. According to MCC, the ALJ and DAB disregarded the difference between an event which is only a potential risk and one which is reasonably foreseeable. The Resident's elopements merely constituted a potential risk that did not place MCC on notice of the immediate threat to his safety or the safety of the other residents. MCC also maintains that the Resident never left the facility for a second time, contrary to the ALJ's findings. As the first elopement and the second alleged elopement involve different facts and foreseeability analyses, we will discuss them separately.

While MCC insists that the Resident's first elopement was not foreseeable, the ALJ and DAB identified several key pieces of evidence indicating otherwise. For example, the record shows that the Resident exhibited exit-seeking behavior—by wandering into areas of the facility where he could not be observed—for some time before he actually eloped. Moreover, the Resident's mental state, history of substance abuse, and withdrawal from narcotics should have alerted MCC to his potential for elopement. On May 3, 2010, almost a week before the Resident's elopement, MCC recognized this threat and revised his care plan to reflect his increasingly active behavior and tendency to wander. As MCC failed to heed the warning signs that the Resident was a high elopement risk, we hold that the DAB's conclusion that the first elopement was foreseeable is supported by substantial evidence. *See, e.g., Cedar Lake*, 619 F.3d at 457 (holding that the SNF "did not take all reasonable steps to prevent [the resident] from wandering out of the facility" given its "prior knowledge of [the resident's] propensity to wander, and [the SNF's] previous development of a care

plan that involved frequent observation and other measures designed to prevent [the resident] from wandering.").

The facts surrounding the Resident's alleged second elopement are disputed by both parties. MCC argues that the ALJ and the DAB erred in finding that the Resident exited the facility for a second time on May 9, 2010. Although there is no dispute the Resident left the second floor of the facility, MCC contends that he was immediately intercepted when he got off the elevator on the first floor. The ALJ, on the other hand, cites the testimony of an MCC nurse who wrote in her incident report that the Resident actually exited the building and entered the parking lot. The record thus presents conflicting testimony on this issue and calls into question the ALJ and DAB's wholesale adoption of one version of the event over the other, equally plausible version.

However, notwithstanding these factual discrepancies, the record demonstrates that the Resident's second alleged elopement was still highly foreseeable. Although MCC contends that the Resident had been placed under strict supervision after his first elopement, the Resident managed to escape the nurse's watch and proceed down the elevator to the first floor, and perhaps even to the parking lot. At the time of the Resident's second attempted elopement, MCC not only had notice that he was agitated and restless, but also that he had the ability to act on these impulses. Furthermore, the ALJ and DAB reasonably concluded that categorization of the second elopement—whether as an actual elopement or merely a trip to the first floor—was "immaterial," since the mere fact that the Resident was able to evade the staff's supervision "twice within 30 minutes, using the same means of egress [shows] that MCC staff was not supervising him adequately, or consistent with his care plan." We therefore hold that the ALJ and DAB reasonably concluded that the Resident did not receive adequate supervision or assistance devices to prevent him from eloping.

*C. Immediate Jeopardy*

MCC challenges the ALJ's and DAB's conclusion that CMS's finding of immediate jeopardy was supported by substantial evidence, and that the period of immediate jeopardy lasted from May 9 through June 1, 2010. Immediate jeopardy is defined as "a situation in which the [SNF's] noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. MCC bears the burden of proving that CMS's immediate jeopardy determination is clearly erroneous. *See id.* § 498.60. CMS's determination that MCC's deficiencies constituted immediate jeopardy was not based solely on the fact that the Resident evaded staff supervision multiple times in one day. It was also based on the nursing home's failure to develop policies and procedures to protect the Resident from elopement and its failure to adequately supervise the Resident, particularly since it was reasonably foreseeable that such an event could occur.

On administrative appeal, DAB also rejected MCC's argument that the Resident's elopements did not constitute immediate jeopardy because it was not a "crisis situation." The Resident's elopement need not result in harm in order to constitute immediate jeopardy. *See Windsor Palace*, 649 F.3d at 299–300 (observing that "a negative outcome need not occur" for CMS to find that the facility was not in substantial compliance with the regulation). The Resident's elopement easily could have escalated into a crisis situation if the MCC staff member had not fortuitously spotted the Resident outside the facility. Since MCC's failure to prevent or address the Resident's elopements had the potential to result in serious harm to the Resident, DAB correctly upheld the ALJ's determination that CMS's designation of immediate jeopardy was supported by substantial evidence.

No. 12-60420

Even if the deficiencies amounted to immediate jeopardy, MCC argues that those issues were abated long before June 1, 2010, the date set by CMS. A facility's immediate jeopardy designation is removed "only [after] the facility has implemented necessary corrective measures." *Florence Park Care Ctr. v. CMS*, DAB No. 1931, at *19 (2004) (H.H.S.). The party challenging the duration of an immediate jeopardy designation has the burden of establishing compliance at a date earlier than that found by CMS. *See, e.g., Kenton Healthcare, LLC*, DAB 2186, at *17 (2008) (H.H.S.) (finding that the provider fell "far short of meeting its burden to prove that it achieved substantial compliance earlier than [the date set by CMS]"). CMS's determination regarding the duration of an immediate jeopardy designation is a finding of fact, which must be supported by substantial evidence. *See Cedar Lake*, 619 F.3d at 456. Under this standard, "CMS's determination of immediate jeopardy (including the duration of the immediate jeopardy) is presumed to be correct, and [the facility] has a heavy burden to demonstrate clear error in that determination." *Liberty Health & Rehab of Indianola*, LLC, DAB No. 2434, at *10 (2011) (H.H.S.).

CMS based its determination of the duration of the immediate jeopardy designation on MCC's failure to take several corrective actions until June 1. For example, while CMS acknowledged that MCC had trained some of its employees on the new elopement procedures in early May, several employees did not finish their training until June 1. Furthermore, because CMS based its finding of immediate jeopardy in large part on a finding that MCC's written policies and procedures were not adequate to prevent residents from eloping, the fact that MCC did not correct those policies and procedures until June 1 suggests that the duration of the immediate jeopardy designation was appropriate. Notwithstanding MCC's contention that the ALJ and DAB did not discuss evidence showing that the facility achieved substantial compliance at an earlier date, we agree with the ALJ and DAB that CMS offered several persuasive

11

No. 12-60420

reasons for determining that the period of immediate jeopardy did not end until June 2, 2010.

## IV.  CONCLUSION

MCC has failed to demonstrate that the ALJ and DAB erred in affirming CMS's factual determinations as supported by substantial evidence. Additionally, MCC has not shown that the ALJ's and DAB's legal conclusions were arbitrary or capricious.  We therefore AFFIRM.